UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ONIKA VAZQUEZ,

       Plaintiff,

v.                                    CASE NO. 8:19-cv-1039-T-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision regarding her applications for a period of disability, disability insurance

benefits ("DIB"), and supplemental security income ("SSI").  Following an

administrative hearing held on August 16, 2017, the assigned Administrative Law

Judge ("ALJ") issued a decision, finding Plaintiff not disabled from November 15,

2014, the alleged disability onset date, through December 6, 2017, the date of

the ALJ's decision.[2]  (Tr. 9-23, 110-41, 331, 335.)

In reaching the decision, the ALJ found that Plaintiff had the following

severe impairments: obesity, affective disorder, anxiety disorder, and hidradenitis

_____

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 25.)

[2] Plaintiff had to establish disability on or before December 31, 2019, her date
last insured, in order to be entitled to a period of disability and DIB.  (Tr. 13.)

suppurativa.[3]  (Tr. 15.)  The ALJ further found that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of sedentary work.  (Tr. 17.)  Then, after determining that Plaintiff was unable to perform any past relevant work, at the fifth and final step of the sequential evaluation process,[4] the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  (Tr. 22-23.)

Plaintiff is appealing the Commissioner's decision that she was not disabled from November 15, 2014 to December 6, 2017.  Plaintiff has exhausted her available administrative remedies and the case is properly before the Court. Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **AFFIRMED.**

---

[3] Hidradenitis suppurativa "is a skin disease that causes pimple-like bumps or boils on and under the skin"; it "starts in the hair follicle in the skin and happens where areas of skin may touch or rub together"; its exact cause is unknown; it is "chronic (long lasting) and can be painful." (Doc. 28-1 at 1.)  Persons more likely to get this disease are, *inter alia*, those who are overweight, those who have a family member with the disease, and those who smoke.  (*Id.*)  The symptoms of the disease are pus-filled bumps on the skin, hard bumps under the skin, and open wounds that drain and would not heal.  (*Id.* at 2.)  The bumps can be large and painful, they are most common in the armpits and groin, and they can cause deep and serious scars.  (*Id.*)  Moderate or severe hidradenitis suppurativa may be treated with a TNF inhibitor, which is a medication known as a biologic.  (*Id.*)  Other medications to treat the symptoms include: antibiotics, corticosteroids, hormone therapy, immunosuppressants, pain relievers, and retinoids.  (*Id.* at 2-3.)  Surgery may be needed to open or drain the bumps or boils.  (*Id.* at 3.)  Laser hair removal may also be recommended.  (*Id.*)

[4] The Commissioner employs a five-step process in determining disability.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

### I.      Standard of Review

The scope of this Court's review is limited to determining whether the

Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841

F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are

supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390

(1971).  "Substantial evidence is more than a scintilla and is such relevant

evidence as a reasonable person would accept as adequate to support a

conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir.

2004).  Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have reached a

contrary result as finder of fact, and even if the reviewer finds that the evidence

preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937

F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991).  The district court must view the evidence as a whole, taking into

account evidence favorable as well as unfavorable to the decision.  *Foote v.

Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d

835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to

determine the reasonableness of the Commissioner's factual findings).

### II.      Discussion

#### A.      The Parties' Positions

Plaintiff argues that the ALJ erred "in making medically unsupported and

erroneous assumptions regarding the cause of the Plaintiff's symptoms as a

result of her hidradenitis suppurativa condition." (Doc. 28 at 2.)  Plaintiff

contends that the ALJ mischaracterized the evidence as to her skin condition,

specifically, as to shaving being the cause of the condition, and improperly

discounted Plaintiff's testimony as to any functional limitations stemming from the

condition.  Plaintiff states that because her skin condition was not caused by

shaving and she was never advised to stop shaving, the ALJ's assumption that

Plaintiff failed to follow prescribed treatment by continuing to shave was

erroneous.  Plaintiff also contends that the ALJ's RFC assessment failed to take

into account her difficulty sitting for prolonged periods of time and her difficulty

reaching frequently due to discomfort in the groin and axillae areas during flare-

ups.

> Defendant responds, in relevant part, as follows:
>
> Plaintiff attempts to use her diagnosis of an unusual skin condition, hidradenitis suppurativa, to support extreme limitations that are completely unfounded by the medical evidence.  The medical evidence simply does not support Plaintiff's allegations that her skin condition caused bumps as large [as] golf balls or grapefruit or that her flare-ups were so painful that she could not move and had to stay in bed without clothing.  Instead, the medical evidence shows that even when Plaintiff experienced skin flare-ups in her armpits and groin, the bumps were small and treatable with antibiotics; her pain level was zero; she was well-appearing and in no acute distress; she remained sexually active, even with active lesions near her groin; motor strength was normal; and gait and stance were normal.  Plaintiff has not demonstrated that her skin outbreaks caused any work-related limitations, and her brief attempts to detract from the lack of evidence supporting her allegations by attacking the ALJ's non-essential conclusions about her shaving habits [sic].

(Doc. 30 at 3-4.)  Defendant adds that "substantial evidence supports the ALJ's

conclusion that shaving contributed to Plaintiff's skin problems."  (*Id.* at 9.)

### B.   Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. May 2, 2008) (per curiam); *see also* SSR 96-6p[5] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

---

[5] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's applications for DIB and SSI predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

When a claimant seeks to establish disability through her own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id.*

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that her pain is disabling through "objective medical evidence from an acceptable medical source that shows . . . a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms," pursuant to 20 C.F.R. §§ 404.1529(a), 416.929(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561. *See also* SSR 16-3p[6] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms" to determine "the extent to which an individual's

---

[6] SSR 16-3p rescinded and superseded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
>
> . . .
>
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[7]  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
>
> . . .
>
> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.  Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the

---

[7] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;

- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## C.   Relevant Evidence

On August 21, 2014, Plaintiff received treatment for symptoms of hidradenitis suppurativa.[8]  (Tr. 464 (reporting such symptoms for over ten years); *see also* Tr. 561 (reporting that Plaintiff underwent surgery for her hidradenitis suppurativa in the past, which helped a little, but she was still getting recurrent abscesses).)  Her physical examination revealed "multiple papular, erythematous lesions" in the bilateral groin and left axilla areas, but no drainage.  (Tr. 463.) She was prescribed Clindamycin and was referred to a dermatologist.  (Tr. 463-64.)

On May 14, 2015, Plaintiff sought treatment for a skin lesion in the right axilla reportedly due to "shaving and the summer heat."  (Tr. 561.)  The lesion was tender, but without drainage.  (Tr. 562.)  She was prescribed Bactrim and Mupirocin ointment for use "after shaving."  (Tr. 563.)

On June 29, 2015, Plaintiff reported that her skin lesions had resolved with

---

[8] Many of the treatment notes pertaining to Plaintiff's hidradenitis suppurativa are authored by various nurse practitioners.

Bactrim, and even though they returned later, they stayed "very small, like pimples, due to using the Mupirocin" ointment.  (Tr. 555.)  On examination, "[p]ustules were seen within the armpits x1, uncomplicated" and "on both buttocks x2 to 3, uncomplicated."  (Tr. 559.)  Plaintiff was prescribed Hibiclens body wash for use in the shower one day prior to shaving.  (*Id.*)  During a follow-up appointment on August 19, 2015, the prescription for Bactrim was re-filled for an abscess under Plaintiff's left arm (with erythematous, serous drainage) and groin area.  (Tr. 551-53.)

On September 21, 2015, Plaintiff had localized skin lesions in the bilateral axillae and groin area, as well as erythematous, serous drainage under her left arm.  (Tr. 548-49.)  The prescriptions for Bactrim and Hibiclens were refilled.  (Tr. 550.)

On October 21, 2015, Glenn Bigsby, D.O., a State agency non-examining consultant, reviewed the records available as of that date and opined that Plaintiff's hidradenitis suppurativa was not a severe impairment.  (Tr. 197-98.)  Dr. Bigsby noted Plaintiff's long history of hidradenitis suppurativa, which was "[w]orse with hot weather and shaving," but was nevertheless "reasonably well controlled with [medications] and good[,] aggressive home care and [treatment]."  (Tr. 198.)  In sum, the condition had a "generally minimal functional [e]ffect," and was, therefore, not severe.  (Tr. 198.)

On November 24, 2015, Plaintiff again sought treatment for skin lesions in her left axilla and right groin lasting for two weeks.  (Tr. 626-27.)  On

examination, there was a "[s]mall erythematous lump to [the] left axilla and right groin; no induration; no discharge," as well as "[s]welling, mass, or lump of skin of [the] upper limb." (Tr. 629.) Plaintiff's prescriptions were refilled, and she was advised to use liquid anti-bacterial soap and to apply warm compresses to her left axilla and right groin areas. (Tr. 626, 629-30.)

On February 19, 2016, Plaintiff had erythematous lumps in her left armpit. (Tr. 624.) She was prescribed Keflex, Mupirocin ointment for use after shaving, and Hibiclens body wash for use prior to shaving. (Tr. 625.)

On May 17, 2016, Plaintiff requested a refill of her antibiotic medication for an active lesion in the right groin area. (Tr. 618.) On examination, "[a] single nodule was seen, purple[,] which [was] subcutaneous with tenderness, and in the pubic area on the right[,] without drainage."[9] (Tr. 620.) Plaintiff was prescribed Bactrim, Hibiclens, and Mupirocin. (Tr. 621.)

On October 20, 2016, Plaintiff had a flare-up of her hidradenitis suppurativa. (Tr. 608.) On examination, there were skin lesions, multiple pustules, and furuncles. (Tr. 610, 612.) She was prescribed Doxycycline Hyclate and Hibiclens and was referred to a dermatologist. (Tr. 613.) On November 22, 2016, Plaintiff had "another flare up of her hidradenitis." (Tr. 604 (noting "[s]kin symptoms abscess in groin from shaving").) She was prescribed Bactrim and Keflex. (Tr. 606.)

---

[9] The record reflects that despite her flare-ups, Plaintiff remained sexually active. (*See* Tr. 548, 552, 562, 597, 601, 605, 609, 616, 619, 626.)

On February 23, 2017, Plaintiff presented to Lucas Bowling, ARNP, with rash in the groin area.  (Tr. 600-01.)  She reported that "when she shave[d], she [got] infections often and ha[d] no intention" to stop shaving.  (Tr. 600.)  Plaintiff was advised "to limit or stop shaving if getting frequent skin infections," but she refused to do so.  (Tr. 603 (also noting that Plaintiff refused to stop smoking[10]).)  She was prescribed Keflex for the bacterial infection and Hibiclens body wash for use "one day prior to shaving as needed."  (*Id.*)

On April 10, 2017, Plaintiff's physical examination revealed no skin lesions or rash, but her prescription for Mupirocin ointment was re-filled for use after shaving.  (Tr. 597-98.)

On June 6, 2017, Lucas Bowling, ARNP, filled out a Hidradenitis Suppurativa Questionnaire, opining that Plaintiff experienced skin lesions involving both axillae, both inguinal areas, and the perineum; and that her condition had persisted for at least three months despite continuing treatment as prescribed.  (Tr. 631.)

### D.    The ALJ's Decision

The ALJ found at step two of the sequential evaluation process that Plaintiff's hidradenitis suppurativa was a severe impairment.  (Tr. 15.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed

---

[10] Plaintiff has been reportedly smoking one pack per day since she was 16 years old.  (Tr. 604, 615.)

impairments.  (*Id.*)  The ALJ stated:

> Section 8.06 (Hidradenitis Suppurativa) was considered, but the
> claimant does not have extensive skin lesions involving both axillae,
> both inguinal areas[,] or the perineum that persist for at least 3
> months despite continuing treatment as prescribed.  Although
> Exhibit 10F notes that the claimant does meet these requirements,
> this is simply not supported by the evidence.  Exhibit 9F, p. 13 notes
> that she usually gets the hidradenitis suppurativa lesions after
> shaving and she does not want to stop shaving.  She has been
> advised to limit or stop shaving, but she has refused (Exhibit 9F, p.
> 8).  Accordingly, she is not following prescribed treatment
> recommendations.  The evidence also shows that the claimant's
> lesions usually resolve with the use of antibiotics but then recur
> again later.  The claimant admitted that her lesions last about 7 days
> and that she has them up to twice monthly.

(*Id.*)

Then, before proceeding to step four, the ALJ determined that Plaintiff had

the RFC to perform sedentary work, except she could:

- occasionally push/pull bilaterally with the lower and upper extremities;

- occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl;

- never climb ladders, ropes, or scaffolds;

- never be exposed to extreme heat and humidity;

- occasionally be exposed to workplace hazards, such as unprotected

  heights and moving machinery;

- work indoors in conditioned, climate-controlled air;

- perform unskilled, simple, routine, repetitive tasks with simple, work-related

  decision-making;

- work with no more than occasional changes in the general nature of the

work setting and tasks to be performed;

- not work at a production pace, defined to mean on an assembly line, or

  where she is paid by the piece produced; and

- have no more than occasional interaction with co-workers and supervisors

  and no work-related interaction with the general public.

(Tr. 17.)

In making these findings, the ALJ discussed Plaintiff's testimony with

respect to her hidradenitis suppurativa, as follows:

> [T]he claimant testified that she has [hidradenitis] with frequent
> outbreaks.  She has not been shaving lately but she is still having
> outbreaks.  Before, it had a lot to do with shaving.  She shaves
> because it is part of her hygiene.  Her outbreaks start out as small
> bumps and they can get as big as a golf ball or grapefruit.  The
> bumps are full of pus.  She cannot do anything when the bumps are
> present and cannot wear anything.  She gets them underneath both
> arms and her whole bottom part (groin and towards the back).  The
> bumps are very painful and sometimes she has to lie down to deal
> with the pain.  When she has the bumps on her armpits, it is difficult
> for her to move her arms; which irritates the bumps.  Having her
> arms closed also irritates the bumps and she has to keep her arms
> open.  When she has bumps in her groin area, she has problems
> moving around, walking and standing.  With bad outbreaks, she
> cannot do anything.  The most she could do is go to the bathroom to
> clean the infected area.  With groin outbreaks, she has to keep her
> legs open and apart.  When she has outbreaks, she does not wear
> any type of clothing at all because it causes irritation.  She cannot go
> out of the house if she has an outbreak.  On average, the outbreaks
> last about seven days.  If she had a job and had an outbreak, she
> would not be able to work because the outbreaks occur at least one
> to two times per month.  The hotter the temperature, the more
> outbreaks she has, but she gets outbreaks all year long.  Her doctor
> treats the condition with antibiotics, creams and a certain type of
> body wash that kills bacteria.  It does not prevent the outbreaks;
> there is no cure.  The medications help to heal the infection for the
> moment.  When she has outbreaks, her father has to do everything

for her, including preparing meals, cleaning and doing laundry.  She has to lie in bed because she cannot move.

. . .  She is okay when she does not have outbreaks; she has no problems standing or walking.  When she has an outbreak, she is in bed and cannot do anything.

. . .  Her doctor gives her Bactrim for the outbreaks, and the Bactrim cures the infection.  When the pus comes out, she has open wounds that eventually scar over, and she has many scars from this.

(Tr. 18-19.)

The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 19.)  The ALJ explained:

The medical evidence confirms that the claimant has a history of hidradenitis suppurativa.  The State agency found this condition was non-severe, and the medical evidence does show that the condition appears to get better.  I have, nevertheless, given the claimant every benefit of the doubt and find it is a "severe" impairment, but the condition does not meet a listing and her testimony at the hearing regarding this condition is not consistent with the medical evidence of record.  As noted above, in order to meet the listing for this condition, the claimant would have to have hidradenitis suppurativa lesions that persist for three months despite treatment.  The evidence shows, though, that the claimant gets these lesions after she shaves and, despite being advised to limit or stop shaving altogether, the claimant has refused to stop shaving (Exhibits 1F, p.15 and 9F, p. 8).  Thus, she is not following treatment recommendations.
. . .
There is no doubt that the claimant suffers from a severe skin condition.  Unfortunately, the medical evidence of record is riddled with reference[s] to the claimant's problems being secondary to shaving.

The claimant also testified that she is basically bedridden when she has a flare[-up] and has to be nude, wearing no clothes at all.  However, this is not expressed anywhere in the medical evidence of

16

> record.  Instead, the evidence shows that in June 2015, she reported
> that the lesions resolved with Bactrim and although they returned,
> they stayed very small (Exhibit 7F, p. 21).  In November 2015, she
> had a lesion at the left groin described as small with no discharge
> (Exhibit 9F, p. 31).  In February 2017, she actually refused genital
> examination and in April 2017, her examination was benign (Exhibit
> 9F, pp. 5  and 1).  These records are not consistent with the
> claimant's allegations of disabling skin lesions.  The claimant also
> testified that she could maybe lift 2 to 3 pounds, but there is no
> impairment that would support such a limitation.  She then went on
> to state that she could lift a gallon of milk and 12-pack of soda.

(Tr. 19-20.)

The ALJ then addressed the medical opinions in the record.  The ALJ gave

"little weight" to the State agency medical consultant's opinion that Plaintiff's

hidradenitis suppurativa was not a severe impairment.  (Tr. 20.)  In finding that

this condition was a severe impairment, the ALJ gave Plaintiff "every benefit of

the doubt" and limited her to no more than sedentary work with postural and

environmental limitations.  (*Id.*)  The ALJ added: "The condition is well

documented in the evidence, although it would likely significantly improve and/or

resolve were the claimant to follow her doctor's recommendation that she stop

shaving.  Although the claimant claims that she still gets the lesions even when

she does not shave, this is not shown anywhere in the evidence of record."  (*Id.*)

Further, the ALJ gave "no weight" to the opinion of a nurse practitioner who

stated that Plaintiff met the requirements of the listing.  (Tr. 21.)  The ALJ

explained:

> The claimant testified that the lesions last one week and she might
> have two outbreaks a month, at best.  This is not listing level
> severity.  Further, there is no basis to consider that her impairment is

as bad/painful as she alleges, given the relatively effortless medical directives with which she remains non-compliant.  Exhibit 7F, p. 21, dated in June 2015, also notes the condition resolved with Bactrim but returned, and she reported that they now stay "very small" and at that point states she is "afraid" to shave.  Thus, outbreaks are not so bad at that point and appear a bit more controlled.  "Fear" of shaving may suggest that she is not shaving, thus contributing to the symptom control.  But it also suggests contemplation to continue shaving.  Finally, Exhibit 1F notes episodes monthly, which is not the same as one episode lasting three months, as required by the listing.

(*Id.*)

### E.    Analysis

The Court finds that the ALJ's decision is based on correct legal standards and is supported by substantial evidence in the record.  First, the ALJ correctly observed that Plaintiff's testimony regarding her skin condition was inconsistent with the medical evidence in the record.  Plaintiff testified that during outbreaks, she cannot wear any clothes, cannot do anything, and must stay in bed due to the large and painful bumps in her axillae and groin area.  (*See* Tr. 121-23 (stating that the bumps can become as big as a golf ball or a grapefruit); Tr. 125; Tr. 129.)  However, as the ALJ noted, the medical evidence of record does not corroborate Plaintiff's statements.  (Tr. 20.)  There are no references in the medical records that the bumps Plaintiff experienced during outbreaks were as large and/or as painful as she described them or that they made it uncomfortable to wear any clothes or to engage in any activity other than rest in bed.  To the contrary, the evidence shows that as a result of Plaintiff's treatment with Bactrim and Mupirocin, her skin lesions stayed "very small, like pimples."  (Tr. 555; *see*

*also* Tr. 629.)  Further, while there were flare-ups every few months and

sometimes every few weeks (but not more frequently than once a month), for the

most part, there was no drainage, pain, or other symptoms to interfere with

Plaintiff's daily activities.  (*See, e.g.*, Tr. 463, 629; Tr. 562 & 620 (noting

tenderness but no drainage); *but see* Tr. 548-49 & 551-53 (noting erythematous,

serous drainage).)

Also, contrary to Plaintiff's testimony that during outbreaks she could not

do anything and relied on her father for meal preparation, cleaning, and doing the

laundry (Tr. 124-25), her father stated in a third-party function report that Plaintiff

was able to clean and do laundry (Tr. 374-75).  Moreover, the medical providers

have not noted any observed or reported difficulties in Plaintiff's ability to perform

any activities of daily living.  Thus, the ALJ's findings about the severity and

limiting effects of Plaintiff's skin condition are supported by substantial evidence

in the record.

Plaintiff argues that the ALJ made a medically unsupported and erroneous

assumption about the cause of her skin condition when the ALJ found that

shaving contributed to the condition.  Plaintiff points out that she was never

advised to stop shaving and that shaving did not cause her condition.  Yet, the

record shows that Plaintiff was advised "to limit or stop shaving if getting frequent

skin infections" and she refused to do so.  (Tr. 603.)  In fact, during the same

visit, Plaintiff reported that "when she shave[d], she [got] infections often and

ha[d] no intention" to stop shaving.  (Tr. 600.)  There are also other references in

the medical record that Plaintiff reported symptoms *due to* shaving and hot weather.  (Tr. 561, 604.)  The records indicate that Plaintiff understood that shaving contributed to her symptoms by leading to more frequent infections. (*See* Tr. 561, 600, 603-04; *see also* Tr. 555 (noting, on June 29, 2015, that Plaintiff was "still afraid to shave").)  Thus, the ALJ's findings that shaving contributed to Plaintiff's symptoms of hidradenitis suppurativa and that Plaintiff refused to limit or stop shaving are supported by substantial evidence in the record.  The fact that Plaintiff was prescribed medicated body wash (Hibiclens) and ointment (Mupirocin) for use before and after shaving does not undermine the ALJ's findings, which are supported by substantial evidence in the record.

### III.    Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ.  Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  Based on this standard of review, the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question is due to be affirmed.

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **AFFIRMED**.

2.    The Clerk of Court is directed to enter judgment accordingly,

terminate any pending motions, and close the file.

      **DONE AND ORDERED** at Jacksonville, Florida, on September 3, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record